**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CENTIMARK CORPORATION,**

            **Plaintiff,**

**-vs-**                                             **Case No. 6:05-cv-136-Orl-DAB**

**A TO Z COATINGS & SONS, INC. and A**
**TO Z COATINGS, INC.**

            **Defendants**
_____

## MEMORANDUM OPINION AND ORDER

This cause came on for consideration following a bench trial. The Court has reviewed the evidence and the applicable legal authorities and, upon due consideration, makes the following findings of fact and conclusions of law.

### *BACKGROUND*

Plaintiff Centimark Corporation is a roofing contractor. Defendants are in the business of applying specialized spray coatings to roofs and other surfaces.

Defendant A to Z Coatings & Sons, Inc. (herein "Sons"), is a now defunct Georgia corporation, that subcontracted with Plaintiff on a series of jobs. According to the testimony, Sons was a family business located in Savannah, with Secretary/Treasurer Teresita Robb owning 51% of the stock, and her step-son, Gerald J. Robb, Jr., CEO of the company, owning 49%. Although not reflected in the corporate records, Gerald J. Robb, Sr., husband of Teresita Robb and father of Robb, Jr., was initially a shareholder in Sons, until he transferred his interest to Jr. prior to the events at issue here. Robb, Sr. remained employed by Sons as its Vice-President, however, and was personally involved in the jobs which are the subject matter of this suit.

According to the testimony, Robb, Jr. left Georgia and moved to Pennsylvania around the year 1999-2000.  Robb, Jr. registered Sons to do business in Pennsylvania in 2000.  Sons was eventually (and apparently informally) dissolved and ceased doing business in Georgia as of December 2004,[1] and Robb, Jr. formed A to Z Coatings, Inc., a Pennsylvania corporation, on January 10, 2005.  Neither Robb, Jr. nor the Pennsylvania entity are defendants to this suit.

After Robb, Jr. left Georgia, Robb, Sr. and Mrs. Robb moved to Florida.  Sons was registered to do business in Florida, and did so, for a short time.  Defendant A to Z Coatings, Inc. (herein "Inc"), a Florida corporation, was formed on March 24, 2005, two months after this suit was filed.  According to the testimony, at the time of its incorporation, Inc was owned by Teresita Robb (49%) and Robb, Sr. (51%).[2]  Robb, Sr. is the President of the company and Mrs. Robb is the Secretary/Treasurer. Robb. Jr. is not a shareholder or an officer of Inc.

Robb, Jr. and Robb, Sr. continue to work together as a "joint venture" on some jobs under the business names of the Pennsylvania and Florida corporations, depending on the time of year and origination of the particular job, but operate out of separate locations.

Centimark asserts that it is owed a total of $228,000.00 in damages, due to Sons' failure to provide acceptable coatings on certain jobs it subcontracted from Centimark.  Plaintiff contends that Inc is liable as the successor/alter ego of Sons.  At issue are four jobs: Bryan Foods, Independent Furniture, Taylor-Wharton, and Talla-Com.  Although Plaintiff asserts breach of contract, and a contract dated April 2, 2002 between Sons and Plaintiff is attached to the Amended Complaint, it

---

[1] This was well after the period during which the contract work at issue was performed but before any litigation was filed.

[2] Apparently, Mrs. Robb is now the sole shareholder of Inc.

-2-

appears that all but one of the jobs (Talla-Com) pre-date the contract. Plaintiff asserts that the other three jobs were done pursuant to oral contracts and purchase orders.

### *THE NATURE OF THE CLAIMS*

The case presents in a rather unusual posture. As evidenced by the docket, a clerk's default was entered against Sons for failure to timely answer, and Sons' motion to set aside the default was denied. Inc, however, has answered and defended, both as to liability and the issue of damages. The case proceeded to trial. At trial, Plaintiff asserted no independent basis of liability against Inc under its contract theories. Rather, Plaintiff claimed that the default established Sons' liability as a matter of law, and thus, Inc was liable for the damages caused by Sons' breach, as Inc is either the alter ego or the successor corporation of Sons. According to Plaintiff, Sons' default foreclosed Inc from challenging liability, and the only issue is whether Plaintiff presented sufficient credible evidence of its damages.

Generally, of course, if liability is well-pled in the complaint, it is established by the entry of a default. *Buchanan v. Bowman,* 820 F.2d 359, 361 (11th Cir. 1987). The general rule, however, is not without exception. Thus, as here, in cases involving more than one defendant, a judgment of liability should not be entered against a defaulting party alleged to be jointly liable, until the matter has been adjudicated with regard to all defendants. *Frow v. De La Vega,* 15 Wall. 552, 82 U.S. 552, 21 L.Ed.60 (1872). Moreover, if the plaintiff prevails on liability against the nondefaulting defendants, he is entitled to judgment against both the defaulting and nondefaulting defendants, but if the nondefaulting party prevails against the plaintiff, in most cases, that judgment will accrue to the benefit of the defaulting defendant, unless that defense is personal to that defendant. *Frow*, 15 Wall. at 554, holding:

> [I]f the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike– the defaulter as well as the others. If it be decided in the complainant's favor, he will then be entitled to a final decree against all. But a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal.

15 Wall. at 554.

This prohibition against logically inconsistent judgments does not apply only to cases where liability is deemed to be joint. In this circuit, it is "sound policy" that "when defendants are similarly situated, but not jointly liable, judgment should not be entered against a defaulting defendant if the other defendant prevails on the merits." *Gulf Coast Fans v. Midwest Elecs. Imp.,* 740 F.2d 1499, 1512 (11th Cir. 1984) (*citing* C. Wright & A. Miller, Federal Practice and Procedure, § 2690, 6 Moore, Federal Practice, ¶ 55.06, and reasoning that it would be inconsistent for the plaintiff to collect a judgment against the defaulting defendant on a contract when a jury, in a suit against another defendant under the same contract, had found that the plaintiff itself had breached that contract).

Here, regardless of whether the liability is deemed joint or several, the defendants are certainly similarly situated and *Frow* applies. Thus, the default of Sons does not foreclose the right of Inc to challenge Sons' liability (as Plaintiff asserts that Inc's liability is purely derivative from that of Sons) on its own behalf, and any benefit arising from that challenge, should Inc be successful, accrues to Sons. The Court addresses Sons' liability, claim by claim, as follows.

### ***THE CLAIMS AGAINST SONS***

*Taylor-Wharton*

According to the testimony and exhibits, Centimark issued a Purchase Order on October 17, 2001, for application of 114,176 square feet of polyurea coating to the roof of this commercial building. The work was performed in November 2001, and Sons was paid in full on December 11,

2001. After the job had been accepted by the Owner, Sons was contacted by Centimark and was requested to perform additional work because leaks had appeared in certain spots. The roof continued to leak, despite Sons' numerous attempts (at no extra charge) to repair the leaks. Although Inc contends that the problems were due to the age of the roof, the deterioration of the rubber gaskets, and the large volume of water which accumulated at the bottom portion of the pitched roof, the Court finds none of these excuses obviates Sons' responsibility to provide what it promised in exchange for the $174,132.00 Plaintiff paid: a roof that didn't leak. The Court accepts the testimony of Jim Esterly, Plaintiff's regional manager, that due to Sons' continued failure to fix the problem, Centimark incurred a total cost of $108,434.36, encompassing a month of labor and materials for applying a primer and 2 coats of acrylic coating over the entire roof.[3]

Sons is liable to Centimark in the amount of $108,434.36 for this claim.

*Independent Furniture*

According to the evidence, Centimark sent Sons a proposal by facsimile on October 18, 2001, consisting of a rough drawing of a roof, along with photographs of admittedly poor quality (Defendant's Exhibit 43). A Purchase Order for the job was issued on October 25, 2001, and provided only "Sub Contract Work-Independent Furniture, $62,500.00" without further description. The evidence indicates that there were skylights on the roof, which Sons was not aware of from the rough drawing and photographs provided. Following coating of the roof, the roof leaked at the skylights. Despite Sons' not including any work relating to the skylights in its price, it caulked the skylights and clear coated them, at Centimark's request, at no charge. Subsequently, Centimark chose to replace the skylights at a cost of $10,000.00, which it claims is Sons' responsibility.

---

[3]Though some question was raised as to whether this choice for repair was prudent or necessary, Inc did not present substantial evidence to the contrary.

-5-

There is no written or oral contract that Sons was to replace skylights in the roof, nor is there evidence that Sons damaged the skylights, sufficient to charge them with the cost of replacement. Indeed, in a letter to the Owner, Centimark asserts that the skylights needed replacing, not due to the fault of Sons, but because they were "cracked and severely dry rotted." (Plaintiff's Exhibit 6). Plaintiff has failed to carry its burden on establishing liability as to this job. Thus, no damages are due.

### *Bryan Foods*

The parties had several different projects at this large food manufacturer. The dispute at issue involves the application of a spray coating to a small area of a cooler floor. Plaintiff contends that Sons contracted to spray the walls and ceiling of a cooler and "do the flooring." Shortly after coating the floor, it peeled and bubbled, and after Sons was unsuccessful at fixing the problem, Plaintiff eventually contracted with another company to reinstall a different floor at a cost of $28,000.00.

According to Sons, however, there was no contract to do the floor and Sons was merely asked by Plaintiff to try to spray coat the floor as an experiment, to see if it would solve the problem the Owner was having with the floor. They tried, it didn't work, and, as they received no money for the experiment and had no contract for the work, they warranted nothing and are not liable for the fix.

Plaintiff has simply failed to establish that the scope of work included the floor. Absent a clear specification, the Court finds no liability as to this job.

### *Talla-Com*

According to the evidence, Sons was subcontracted to install a foam roof with polyurea coating on this commercial building, at a cost of $260,000.00. Following the application, the foam cracked at the expansion joint, probably due to the failure of the product to accommodate the

movement of the building. Sons was called and caulked the area, at no charge. The Owner was not satisfied, however, and Centimark applied a primer and two coats of acrylic coating to fix the problem, at a cost of $60,000.00.

Sons does not dispute the above, but contends that it performed the job to Plaintiff's specifications, and had they been notified of a continuing problem, they would have involved the manufacturer of the coating, who would probably have authorized the cost of re-application or other corrective repair work.

Plaintiff has established damages with respect to this claim. Although the subcontract signed by the parties arguably applies to this job, the Court finds that it is woefully incomplete, lacking essential terms such as a signed, completed scope of work, and neither party followed its terms, in any event. As such, the parties proceeded as they always had, on an oral agreement, followed by a purchase order and an invoice. The Court is therefore not persuaded by Sons' insistence that Plaintiff failed to provide the written notice of a problem and opportunity to correct provided in the written contract. Nor is the Court convinced that it would have made a difference in any event. Sons was provided with an opportunity to fix the roof and was unsuccessful. There is nothing to support a conclusion that Sons is entitled to more than one opportunity to fix the problem. The testimony that the manufacturer would probably have paid for re-coating or repair is speculative, at best. Sons is liable for the $60,000.00 repair.

Based on the above, the Court finds as a matter of law that Sons is liable to Plaintiff in the total amount of $168,434.36, plus the costs of this action, for which, let judgment issue.

### *THE CLAIM AGAINST DEFENDANT INC*

Having established that Sons is liable to Plaintiff, the Court next addresses Inc's liability for that sum, under Plaintiff's asserted theory of alter ego or successor liability. The Court notes that this is a defense personal to Inc for purposes of the *Frow* analysis.

*Alter Ego*

Plaintiff argues that Inc is no more than the alter ego of Sons, and that, as such, Inc is liable for the debt, contending:

> The alter ego theory is typically advanced for the purpose of piercing the corporate veil. *See e.g., Dania Jai-Alai, Inc. v. Sykes*, 450 So. 2d 1114 (Fla. 1984). The corporate veil is pierced when: (1) the corporation was dominated and controlled by shareholders such that it was an alter ego used to shield the shareholders from personal liability; (2) the corporate form was used through improper conduct; and (3) the improper conduct caused injury to the one seeking to pierce the corporate veil. *Seminole Boatyard v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998). When all three have occurred, the court pierces the corporate veil by ignoring the corporate form in order to make shareholders liable for the actions of a corporation. *Sykes*, 450 So. 2d at 1114.

Doc. No. 102 at 10.[4]

The difficulties in applying this theory to the facts at hand are evident. Plaintiff does not seek to "pierce the corporate veil" and hold shareholders of Sons liable; it seeks to hold another corporation liable. Inc is not a shareholder of Sons, and, in fact, was not even in existence during any relevant time in Sons' corporate life. Moreover, there has been no showing of improper corporate conduct sufficient to pierce the corporate form. The theory is inapplicable here.

*Successor Liability*

---

[4]Plaintiff misstates the test set forth in *Seminole Boatyard.* The court actually said: "Three factors must be proven by a preponderance of the evidence: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. 715 So.2d at 990.

Plaintiff fares better on its alternate theory of liability -- that Inc is the successor corporation to Sons. "Generally, Florida law does not impose the liabilities of a predecessor corporation on a successor corporation unless: (1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor." *Laboratory Corp. of America v. Professional Recovery Network,* 813 So.2d 266, 269 (Fla. 5th DCA 2002), *citing Bernard v. Kee Mfg. Co., Inc*., 409 So.2d 1047, 1049 (Fla. 1982). Under the continuation of business theory, the successor corporation is liable for the predecessor's debts when the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name. *Id.* at 270, *see also Amjad Munim, M.D., P.A. v. Azar,* 648 So.2d 145, 154 (Fla. 4th DCA 1994) (*citing Bud Antle, Inc. v. E. Foods, Inc*., 758 F.2d 1451, 1458 (11th Cir. 1985).) The key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation. *Antle,* 758 F.2d at 1458-9 ("purchasing corporation must not merely be a 'new hat' for the seller, with the same or similar entity or ownership" (internal citation omitted).)

Plaintiff contends that Inc is the successor corporation of Sons, due to similar principals and similar nature of the business, and the timing of the new incorporation. The Court finds the evidence sufficient to conclude that Inc was merely a new hat for Sons.

Initially, the Court finds that the individuals were hardly rigid in observing strict corporate formalities. Although the shareholders of the two companies are not identical, the parties acted at all times as though "A to Z" was one family business. The shareholders and officers of Sons and Inc are all related, and, although Robb, Jr., CEO and stockholder of Sons, owns no part of Inc, nor is he an

officer or employee, the evidence is undisputed that the Florida and the Pennsylvania corporation would often jointly work on jobs in an informal fashion, thus blurring any real distinction between the three companies.  There is no real question that Robb Sr. merely picked up where he left off and moved the business (which performs identical services as Sons) to Florida.

As for assets, Junior testified that Sons owned very little in the way of hard assets, but that the computers, files and such it did own went with him to Pennsylvania.  Junior personally owned the cargo trailer and truck Sons used, the sprayers were personally owned by both the Robbs and leased to the company, and materials were bought by the company as needed.[5]  It is clear, though, that the most valuable assets of the company were the services of key employees Schwenk and Robb, Senior, and the goodwill and reputation of the company.  Inc obtained and used these assets to carry on the same basic business as Sons.

In *Munim,* the state fourth district court of appeal held:

"For all intents and purposes, the new P.A. is the old P.A. dressed up with a new name and controlled by the same individual. We agree with the trial court that Pulmonary Associates is a mere continuation of the business of Munim, P.A. because it has the "same management, personnel, assets, location and stockholder" as that of Munim, P.A.

648 So. 2d at 154 (internal citation omitted).  Here, the management and personnel are essentially the same.  Although Robb, Jr. was not a stockholder of Inc, the Robbs testified that father and son continued to work together on jobs, with no formal contracts or accounting between them. The key assets (the Robbs) as well as the few hard assets of Sons, were readily available to Inc through continued utilization of this informal arrangement. While the location is dissimilar, in that Sons was located in Georgia and Inc is a Florida corporation, the record indicates that all three corporations

---

[5] Were the Pennsylvania corporation a party and subject to jurisdcition here, it might also be found to be a successor. However, its potential liability is not before the Court in this case.

were not limited to a particular geographical location. Indeed, Junior testified that during the winter months, when work was scarce up north, he would assist his father in jobs in warmer climes. *See Patin v. Thoroughbred Power Boats Inc*., 294 F.3d 640 (5th Cir. 2002) (noting that under Florida law, "a 'mere continuation of business' will be found where one corporation is absorbed by another, as evidenced by an identity of assets, location, management, personnel, and stockholders." *Id.* at 650.)

On the record before this Court, Sons was "absorbed" by Inc and the Pennsylvania corporation. As the Pennsylvania corporation is not a defendant here, any issue as to its liability is not before the Court. The Court finds that Inc is liable as a successor corporation to Sons and thus Plaintiff is entitled to judgment in its favor as to both named Defendants, jointly and severally.

## *CONCLUSION*

The Clerk is directed to enter judgment in Plaintiff's favor against Defendants, jointly and severally, in the total amount of $168,434.36, plus the costs of this action, and to close this case.

**DONE** and **ORDERED** in Orlando, Florida on December 21, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record